PAUL HASTINGS LLP
Steven A. Marenberg (Bar No. 101033)
stevenmarenberg@paulhastings.com
James Pearl (Bar No. 198481)
jamespearl@paulhastings.com
Jennica K. Wragg (Bar No. 328410)
jennicawragg@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: (310) 620-5700
Facsimile: (310) 620-5800

Attorneys for Plaintiff,
GENEXA INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENEXA INC.,<br><br>Plaintiff,<br><br>v.<br><br>KINDERFARMS LLC,<br><br>Defendant. | Case No.  2:22-cv-09291<br><br>**COMPLAINT FOR:**<br><br>1.  **LANHAM ACT FALSE ADVERTISING AND UNFAIR COMPETITION;**<br><br>2.  **FALSE ADVERTISING (CALIFORNIA LAW);**<br><br>3.  **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**<br><br>4.  **CALIFORNIA UNFAIR COMPETITION.**<br><br>**JURY TRIAL DEMANDED.** |

1      Plaintiff, Genexa Inc. ("Genexa"), upon knowledge and upon information

2  and belief, alleges as follows against Defendant KinderFarms LLC

3  ("KinderFarms"):

4  **I.      INTRODUCTION AND THE NATURE OF THIS ACTION**

5      1.      This lawsuit, for false and misleading advertising and unfair business

6  practices, is brought by a small company of innovators, Genexa.  Genexa has

7  redefined the over-the-counter ("OTC") medicine market by creating what are

8  known as "clean" medicines – medicines with the same effective active ingredients

9  as their brand-named counterparts, but without any artificial inactive ingredients.

10  Genexa's products have been blatantly copied by a celebrity-backed business that

11  now also sells "clean" medicines but, unlike Genexa, does so in a reckless and

12  dangerous manner.  The copycat calls itself KinderFarms (pronounced "Kīnder-

13  Farms").  But taking credit for the hard work and innovation of others is not "kind."

14  Likewise, making false and misleading statements that could have truly dangerous

15  consequences for consumers is not "kind" – it is unlawful.

16      2.      In 2020, Genexa, recently described as "One of the World's Most

17  Innovative Companies," created the "clean medicine" category, a submarket within

18  the larger market for OTC medicines.  At that time, Genexa introduced to the

19  market a set of OTC pain and cold relief products designated as "clean," in that

20  they were formulated by removing artificial inactive ingredients like

21  propylene glycol, high fructose corn syrup, sorbitol, dyes, titanium dioxide,

22  sodium benzoate and disodium EDTA that were components of well-known OTC

23  products such as Tylenol pain-relief medicine and Mucinex cough medicine, and

24  replacing them with a unique combination of clean, naturally-based ingredients

25  such as organic agave syrup and citrus extract to accompany the active medicinal

26  ingredients, such as acetaminophen and dextromethorphan.  Genexa described its

27  products, which were the result of several years of innovative research – as "Real

28

Medicine Made Clean"®; that is, medicine made with "the same active ingredients you need, but without the artificial ones you don't."  Genexa's products not only garnered critical acclaim, but successfully appealed to a subsection of the market comprised of consumers who were interested in children's OTC medical products made "clean."

3.    In November 2022, Defendant KinderFarms launched a line of its own "clean" OTC medicine products called "KinderMed." But, in so doing, KinderFarms uses a "dirty" competitive strategy that includes copying, in many or all material respects, the names of Genexa's products, the ingredients of Genexa's products, the packaging of Genexa's products and many of the marketing techniques used by Genexa.

4.    Not content, however, merely to mimic or copy Genexa, KinderFarms sought to compensate for its products' lack of originality by inducing a famous actress, Jessica Biel, to serve as a so-called "Founder" of the company, and then use her celebrity status to promote the launch of KinderMed products in a series of television talk show appearances where she promoted KinderMed products to national audiences.  In KinderMed's advertising, Ms. Biel has suggested that these products are unique and has misleadingly stated that "in the pharmacy aisle, there is nothing with clean and effective ingredients," even though she and KinderFarms are well aware of the existence of Genexa's products, which they have slavishly copied.

5.    Worse yet, Ms. Biel's colleagues at KinderFarms have apparently induced her to repeatedly make the false and (dangerously) misleading statement that KinderFarms' products are "non-toxic," when that is demonstrably untrue, in order to gain a competitive advantage over Genexa's products that, in many instances, appear side-by-side with KinderMed in pharmacy aisles.  Genexa's products make no such claim since, as explained below, no such claim can safely

and responsibly be made.

6.    KinderFarms is a thinly capitalized company that has received important funding from a private equity investment firm known as Alliance Consumer Growth ("ACG").  Notably, before it invested in KinderFarms, ACG purported to explore an investment in Genexa, and in the context of undertaking "due diligence for that investment, gained access to, pursuant to a strict Non-Disclosure Agreement, some of Genexa's most confidential information including the specifications of Genexa's products, Genexa's research and development, quality and regulatory information, Genexa's planned packaging  for its products, Genexa's product pipeline, Genexa's suppliers used to manufacture Genexa products, and communications with retailers who would be selling these products.  Armed with this information, ACG turned to discussions with KinderFarms, which had, to Genexa's knowledge and belief, not previously announced an intent to enter the clean medicine market.  Thereafter, KinderFarms then entered the OTC market with nearly the exact same products, similar packaging and marketing, selling to the same customers and using a manufacturer Genexa had disclosed to ACG.  Given all this, and KinderFarms' unprecedentedly short time to develop and test its OTC products, Genexa is informed and believes that ACG shared Genexa's confidential information with KinderFarms, providing KinderFarms with an unearned shortcut to the market.  Notably, ACG has prominently touted its investments in other celebrity-faced companies on its website but has curiously sought to conceal its backing of KinderFarms.

7.    Genexa welcomes fair and responsible competition not only from traditional pharmaceutical companies and their products, but from purveyors of "clean" medicine products should they enter the "clean medicine" market in the future.  But KinderFarms has gone too far, and by so doing has violated the Federal Lanham Act, 15 U.S.C. § 1125(a)(1), and California law as described

herein.  As a result, Genexa is entitled to injunctive and other forms of relief as set forth below.

## II.   PARTIES

8.   Plaintiff Genexa Inc. is a corporation duly organized and existing under the laws of the state of Delaware with its principal place of business in Atlanta, Georgia.

9.   Genexa is informed and believes that Defendant KinderFarms LLC is a limited liability company, organized under the laws of Delaware, with its principal place of business located within the Central District of California in Redondo Beach, California.  KinderFarms manufactures, markets, sells, and distributes its OTC medicine products under the brand name, "KinderMed," in interstate commerce.

## III.   JURISDICTION AND VENUE

10.   This is an action for false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and for false advertising, unfair competition, and intentional inference with contractual relations under California law.

11.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 because the complaint involves a federal question under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  This Court also has supplemental jurisdiction over the state law claims arising out of the same conduct that forms the case and controversy at issue under 28 U.S.C. § 1367.

12.   This Court has specific personal jurisdiction over KinderFarms. KinderFarms is headquartered in this District and has purposefully availed itself of the privileges of conducting activities in the forum.  KinderFarms is registered with the California Secretary of State to do business in the state and regularly and systematically transacts business in and directed to the State of California, giving rise to the claims in this action, including its publication of false and misleading

statements in commercial advertising.  KinderFarms committed many of the acts that form the basis of Genexa's claims—including dissemination of false and misleading ads—in California and in this District, including via the internet, television commercials, and social media.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because KinderFarms transacts business in this District and a substantial part of the events giving rise to the claims occurred and are continuing to occur in this District.

## IV.   FACTUAL BACKGROUND

### A.   Genexa's Revolutionary Development of "Clean" OTC Medicine Products

14.     For many years, consumers seeking OTC medicines to remedy and reduce common ailments, including coughs, congestion and fevers, were provided little choice in the marketplace.  The OTC drug products manufactured and sold by conventional pharmaceutical companies such as Johnson & Johnson, Pfizer, or Proctor & Gamble had effective active ingredients, but also contained, as "inactive" ingredients, a plethora of artificial substances, including dyes, preservatives, sweeteners, common allergens, and other synthetic fillers (e.g., FD&C red dye no. 40, sucralose and titanium dioxide), including ingredients which are banned, or require warning labels, in other countries.

15.     Genexa was founded in October 2014 by two entrepreneurs, David Johnson and Max Spielberg, with the goal of providing consumers a clean alternative for OTC drug products.  With the increasing prominence of organic, clean products in other industries (namely food, beauty, personal care and cleaning products), Messrs. Johnson and Spielberg recognized a void in the marketplace for "clean" OTC medicine products.  Thus, they founded Genexa with the mission of revolutionizing the medicine aisle with clean medicines—medicines using the same effective, active ingredients needed to treat the underlying condition, but without

the artificial ones.

16.     Described by the media as the *first* clean medicine company, Genexa undertook years of research aimed at developing, manufacturing and introducing to the marketplace new OTC medicines containing the same active ingredients as category leaders (e.g., acetaminophen, the active ingredient in Tylenol, and dextromethorphan, an active ingredient in Mucinex and Robitussin cough syrup, to use but two examples) but without any of the unnecessary artificial ingredients— including artificial preservatives, dyes, sweeteners, or common allergens, as inactive components of these well-known products.

17.     To develop its products, Genexa harnessed the knowledge of medical professionals, as well as highly respected experts with extensive experience in the pharmaceutical industry.  Genexa spent several years performing extensive research to find clean, natural substitutions to the synthetics and potential toxins found in nearly all OTC medicines, replacing them with "clean" ingredients that would adequately perform the same functions as these synthetics, thus providing for stable, long-lasting products on pharmacy and retailer shelves.  Ultimately, Genexa settled on incorporating a combination of agave syrup – derived from the naturally occurring agave plant, along with naturally occurring citrus extract – to create the basis for the preservative system that preserves the longevity of Genexa's medicines.  Genexa became the first drug company to use agave and citrus extract in such a manner.

18.     In 2020, Genexa introduced its newly developed products to the market.

19.     Genexa's entry to the marketplace was a seminal development in the consumer pharmaceutical industry; it disrupted the established order of the business, finally offering consumers a real choice.  Since the introduction of its first products, Genexa has continued to develop for and sell new products to a growing

customer base (most of whom previously would have purchased traditional OTC medicines full of synthetic inactive ingredients). Customers have embraced these "clean" OTC alternatives as safe, and in many instances, more desirable products to treat symptoms arising from illness and pain. Genexa now markets its clean OTC medicines to consumers through over 45,000 retailers nationwide, including through retailers located in the Central District of California, and also sells its products directly to consumers through various online platforms. It is constantly working to develop new clean medicine products for children and adults.

20.    In accordance with an increasing consumer preference for organic, chemical-free, and other naturally occurring products—products comprised of "clean" substances—Genexa's OTC medicinal products filled a void in the marketplace and disrupted the traditional OTC pharmaceutical offerings available to purchasers.

21.    After approximately three years of rigorous product development, Genexa launched its first four "clean" OTC pediatric medicines in 2020 under the Genexa brand. These included:

- Kids' Pain & Fever
- Kids' Allergy
- Kids' Cough & Chest Congestion
- Kids' Tummy Relief

22.    Genexa used the tag line, "Real Medicine, Made Clean" which has been registered with the United States Patent and Trademark Office.

23.    Genexa's products, its industry, ingenuity, and commitment to disrupt the OTC pharmaceutical industry have drawn praise from numerous sources and publications nationwide. For example,

- In an article titled, "Meet the Founder of Genexa the 1st 'Clean Medicine Company,'" *Us Magazine* described Genexa as "the

only clean medicine company out there that has removed artificial inactive ingredients from their products, like propylene glycol, sorbitol, starch wheat, stearyl alcohol, sodium benzoate and disodium EDTA." (https://www.usmagazine.com/shop-with-us/news/genexa-clean-medicine-company/)

- In a 2020 article titled, "How Genexa is Leading the Clean Medicine revolution and Getting us to 'Ditch the Dirty'", *Forbes* recognized that Genexa has created "a new category around clean medicine." (https://www.forbes.com/sites/afdhelaziz/2020/10/13/how-genexa-is-leading-the-clean-medicine-revolution-and-getting-us-to-ditch-the-dirty/?sh=69de2501560f)

- In a different article, *Forbes* magazine noted that "Genexa makes the only OTC medications that are free from allergens and other potentially harmful ingredients." (https://www.forbes.com/sites/meimeifox/2021/01/11/these-2-companies-are-leading-the-clean-wellness-movement/?sh=482e07756af6)

- Recognizing Genexa as the "first and only clean medicine company," Genexa was named to *Fast Company*'s prestigious annual list of the World's Most Innovative Companies in early 2022. (https://www.businesswire.com/news/home/20220308005372/en/)

24. Since 2020, Genexa has continued to expand its product offerings to include clean drug products for infants as well as for adults. Genexa has invested millions of dollars in innovation, including developing its formula for "clean" ingredients, to accompany the active science-based medicinal ingredients and other research and development. Annually, Genexa continues to spend millions of dollars on research and development to continue providing families with clean

medicines they can trust.

25.     Genexa has also invested millions more dollars in product marketing; advertising, including media advertising; marketing personnel-related costs; and research and development.  Genexa employs and consults with many research and development professionals, quality control specialists, and individuals with marketing expertise to perfect its products and distribute products to its customer base.  Genexa's significant investments and high standards for quality have yielded considerable goodwill contributing to its superior reputation in the clean medicine industry.

26.     In an effort to provide families with full transparency and make it easy for families to see what ingredients appear in the OTC products they buy (and what is not in them), Genexa lists directly on its packaging, separate from the requirements imposed by the FDA, all ingredients with the simple statement, "And that's all."



27.     Establishing goodwill and trust with its customers is at the heart of

Genexa's business model.  Genexa takes pride in providing families, many of whom are exceptionally skeptical of the "Big Pharma" OTC medicinal products available, with products they can trust.  To build this trust they use convenient and easy to read packaging, so consumers know exactly what they are getting.  Genexa has sold its products in the marketplace for over two years, and in the process has built a strong reputation and acquired substantial goodwill.  Genexa has not only built a strong reputation for itself but has cultivated what it means to produce "clean" medicine.

28.     After years of intense research, development, testing, and fundraising, in 2020, Genexa released its first set of clean OTC pediatric medicines using entirely natural or organic inactive ingredients.  Among these ingredients was agave and citrus extract as the base of Genexa's liquid products, making Genexa the first drug company to use agave and citrus extract as a base for a drug product.  Genexa combined agave with citrus extract as the preservative system for its products—a highly unusual and novel concept.

**B.     KinderFarms, Launches as a Health and Wellness Brand**

29.     Genexa is informed and believes that, in or around 2018, natural products entrepreneur, Jeremy Adams, established KinderFarms and is the founder of the company.  At some point thereafter, Mr. Adams recruited well-known actress and model Jessica Biel to serve as the "face" of the company, notwithstanding the fact that Ms. Biel has no background in medicine, science, product development, marketing, or finance.  *See, e.g.*, Jessica Biel – Wikipedia.  Rather, Genexa is informed and believes that, sometime after the company was founded, and independent of the development of any KinderFarms' products, KinderFarms contracted with Ms. Biel, and as part of her compensation for promotional services and lending her name and likeness to KinderFarms she may have been provided equity in the company.

30.     As of about September 2019, when KinderFarms launched its first products, the company's focus was *not* on the development, introduction, or sale of OTC medicine products, but rather on natural beverage products.  Specifically, KinderFarms initially only sold hydration products, including "Kinderlyte," a natural, medical-grade drink (marketed in various flavors) that was designed to help with dehydration.  Thereafter, in or around September 2021, KinderFarms launched a product line of organic protein shakes under the label, KinderSprout.

31.     Genexa is informed and believes that it was not until sometime around mid-2021 or later that KinderFarms considered entering the clean OTC medicine business and, at that time, KinderFarms had undertaken no significant research into the composition of any clean OTC products, nor had it commenced the required time-consuming testing of any such products–a requirement before they can be marketed to the public.

32.     Genexa is informed and believes that KinderFarms' decision to enter the clean OTC medicine market was driven and facilitated by information provided to it by representatives of a private equity investment firm ACG, which, as noted, had previously pursued an investment in Genexa and which was provided extensive access to Genexa's confidential information as part of the "due diligence" process.

**C.     KinderFarms Introduces its Line of Clean Medicine Products Under the Name, KinderMed, which are Copied in Almost Every Material Respect from Genexa's**

33.     On or around November 15, 2022, KinderFarms announced the launch of KinderMed – a line of "clean" children's medicines, also made with clinically proven active ingredients, but with "clean, Kinder [sic] inactive ingredients" creating clean OTC medicine products to compete with Genexa's.  Like Genexa, KinderFarms distributes KinderMed products to retailers nationwide as well as sells its products directly to consumers through various online platforms.  KinderMed

branded products now often appear on retailer shelves right next to Genexa's.

34.     Genexa and KinderFarms are the only two companies actively engaged in the production and sale of "clean" OTC medicine products.  As such, the two companies' products directly compete with each other and KinderMed's sales already have, and will continue to have, the effect of diminishing the sales of Genexa's products.

35.     Virtually everything about KinderFarms' clean medicine products copies or mimics Genexa's products.  For example, as the chart below shows, three of the four OTC "clean" children's medicines included in the KinderMed launch have identical or virtually identical names to Genexa's products.

| **Genexa Product Name** | **KinderMed Product Name** |
|---|---|
| "Kids' Pain & Fever" | "Kids' Pain & Fever" |
| "Kid's Cough & Chest Congestion" | "Kids' Cough & Congestion" |
| "Infants' Pain & Fever" | "Infants' Pain & Fever" |

36.     The near identical nature of the names cannot be attributed to the type of product at issue.  Genexa's product names used terms that were arbitrary and different from those commonly used for these types of products.  For example, prior to Genexa, pain relief products designed for children used the term "Childrens'."  Genexa made a conscious decision to use the term "Kids'" instead, and KinderFarms copied that, as well as the arbitrary term "Pain & Fever" (including the "&" instead of the more commonly used word, "and").

37.     The ingredients contained in these products are nearly identical, too, as are their descriptions.  Beyond the fact that the active ingredient in Genexa's Kids' Pain and Fever and Genexa's Infants' Pain and Fever, and KinderFarms' Kids' Pain & Fever and Infants' Pain & Fever – acetaminophen – is the same, more notable is the fact that the inactive ingredients, which distinguish

clean medicine products from traditional OTC drug products, are identical (with the exception of the immaterial difference in flavors) as well.  The similarity of ingredients is not dictated by chance or obviousness.  Genexa researched the combination of natural ingredients that would create effective, shelf stable products and be comparable to the chemical ingredients of the leading brands for years.  The combination was unique and new to this line of products.  KinderFarms simply copied Genexa's inactive ingredients, without doing the work on its own.

| **Genexa's Product** | **KinderFarms' Product** |
|:---:|:---:|

 

38.     KinderFarms' copying of Genexa's efforts does not end there.  The similarities between the packaging of KinderFarms' KinderMed products and Genexa's products, that have been in the marketplace for over two years, is apparent and readily yields the inference that KinderFarms designed its packaging to be as close as possible to Genexa's.  As a comparison of the packaging of the parties' respective "Kids' Pain & Fever" products, set forth below, shows:



39.     The layouts of the packages are almost identical, as are the color, design, type font, and other wholly arbitrary design elements.  Among other things, both packages contain a signed testimonial, signed by their respective "Founders" – an unusual and arbitrary element in and of itself – that is placed in the exact same spot on the packaging above the dosing information.  Both packages incorporate a fanciful drawing of an animal on the front of the packaging, which is not intrinsic to the nature of the product.  Both packages list the ingredients of the product in the exact same spot – again, an arbitrary design decision not dictated by any legal or regulatory requirement.  Moreover, the tag lines are similar—Genexa's, "Real Medicine, Made Clean" and KinderMed's, "Real Medicine Kinder Ingredients,"

and both incorporate a statement about the transparency of the ingredients—Genexa's, "And that's all" and KinderMed's, "that's it!"  To put it bluntly, it is hard to see KinderFarms' KinderMed packaging as anything but a deliberate attempt to copy Genexa's packaging and marketing.

40.     Another significant and damaging effect of KinderFarms' marketing and marketing efforts is KinderFarms' deliberate efforts to convince consumers that it, and not Genexa, is the *originator* of the clean OTC medicine industry.  In particular, Ms. Biel has suggested that KinderFarms is the first clean medicine company and that its "clean" medicines are the first of their kind—an implication that is patently false.  In a video, Ms. Biel relates a personal anecdote that her son was sick with the flu and she could not find products without artificial ingredients that she was comfortable giving to him.  She continues, "and that's when I realized that there was a really major missing element in the pharmacy aisle, *there is nothing with clean and effective ingredients*."  (https://thecitylife.org/2022/11/15/jessica-biels-kinderfarms-launches-clean-medicine-brand-kindermed/).  Likewise, when appearing on the Rachael Ray Show on or about November 23, 2022, Ms. Ray stated to Ms. Biel, while holding a box of KinderMed, "the concept is so brilliant."  Ms. Biel did not dispel Ms. Ray's obvious misconception that KinderFarms originated the concept of creating and selling "clean" OTC medicines for kids.  In fact, when answering Ms. Ray's question as to "how long and what went into this coming to be," Ms. Biel responded that, "a lot went into it."

41.     Ms. Biel's' own Instagram social media page confirms that KinderFarms has succeeded in creating confusion as to which company is the innovator in this part of the market.  On or about November 15, 2022, Ms. Biel posted to her personal Instagram page, and on behalf of KinderFarms' Instagram page, an introduction to KinderMed describing KinderMed as the "newest addition to the family," to "make clean medicine accessible to as many families as possible."

In response to Ms. Biel's advertising, some users expressed their excitement for what, in their minds, was a novel idea.  One Instagram user remarked, "Wowzer that is smart," and other one, "Love this!!! Great idea!!"

 

42.    KinderFarms' claims such as these – to wit, that no other clean medicine products are available to consumers seeking such products and/or that KinderFarms' is the original clean medicine company – are false, misleading, and create consumer confusion that damages Genexa's goodwill and reputation as the innovator in this industry – a true fact that has contributed to Genexa's commercial success to date.

43.    Moreover, KinderFarms' false claims in this regard have another potential effect given the celebrity-driven, nationwide and multi-platform marketing blitz employed by KinderFarms – the claims have the tendency to create "reverse" confusion in consumers' minds, leaving the impression that the similarities between Genexa's products and KinderMed are the result of Genexa copying KinderFarms and not the reverse.  This, too, harms Genexa's goodwill and commercial prospects.

**D.    KinderFarms' Advertisements Claiming Their Products are Non-Toxic are False and Misleading**

44.    Equally or even more troubling than the statements KinderFarms makes about the uniqueness of its products are the false and misleading statements

KinderFarms makes about the ***non-toxic*** nature of its KinderMed products.  On the majority of KinderMed products, in a box, appears the following statement:



45.    KinderFarms' statement – that is, the "Promise" by its "Co-Founder," Ms. Biel, that it produces "non-toxic" health products (highlighted for ease of reference) – is false and misleading.  It is also dangerous and threatens harm to consumers.  KinderFarms repeats these false statements in materially identical form on its website.  See e.g., https://kinderfarms.com/products/kindermed-kids-pain-fever/.

46.    KinderFarms' KinderMed products are not "non-toxic" health products.  KinderMed's "Kids' Pain & Fever" and "Infants' Pain & Fever" products contain acetaminophen.  It is the sole active ingredient found in KinderMed's Infants' Pain & Fever and KinderMed's Kids' Pain & Fever products.  When used properly and in accordance with the recommended daily dosage, acetaminophen is an effective pain-relieving and fever-reducing agent.  But its potential potency cannot be taken lightly, nor can it accurately be described as "non-toxic."

47.    There is a consensus in the medical community, also reflected in guidance by the federal Food and Drug Administration ("FDA"), that acetaminophen is a highly toxic substance.  Although many perceive that

1   acetaminophen is safe and can be taken with impunity, the truth, however, is that

2   acetaminophen is toxic when taken in excess both acutely and chronically.

3   Acetaminophen toxicity is a common cause of acute liver failure in children and

4   adolescents.  (https://www.chp.edu/our-services/transplant/liver/education/liver-

5   disease-states/acetaminophen-toxicity).  It has the potential to cause serious liver

6   damage if more than directed is used.

7   (https://my.clevelandclinic.org/health/articles/21188-acetaminophen-toxicity-in-

8   children-and-adolescents).  And, an acetaminophen overdose can be fatal.

9         48.    KinderFarms' statement about the non-toxic nature of its products is

10  contrary to the widespread expert consensus that acetaminophen carries toxicity

11  potential, as reflected in FDA information and guidance from health professionals,

12  making KinderFarms' "promise" false and misleading.  These claims are dangerous

13  to the consuming public and injunctive relief should issue requiring the correction

14  of KinderMed packaging and the recall of products in the marketplace.

15        49.    Likewise, KinderFarms' statements that its Kids' Cough and

16  Congestion product, which contains active ingredients Dextromethorphan HBr, and

17  Guaifenesin and Kids' Nighttime Cold and Cough product, which contains

18  Diphenhydramine HCl and Phenylephrine HCl, are "non-toxic" are false and

19  misleading.  Diphenhydramine, an ingredient commonly found in OTC drug

20  products such as Benadryl, is a common cause of anticholinergic toxicity.  In

21  September 2020, the FDA released a warning regarding the dangers of taking more

22  than the recommended doses of Benadryl.  (https://www.fda.gov/drugs/drug-safety-

23  and-availability/fda-warns-about-serious-problems-high-doses-allergy-medicine-

24  diphenhydramine-benadryl).  Additionally, reports of adolescents intentionally

25  overdosing on diphenhydramine has recently drawn national attention.

26  (https://poisoncontrol.utah.edu/news/2021/11/diphenhydramine-toxicity).

27  Dextromethorphan poisoning can also occur.  Though these substances can be safe

28

19
COMPLAINT

and effective cough suppressants, recreational and accidental abuse can, and has, occurred with dire consequences because of the inherent toxicity of these substances. (https://www.poison.org/articles/dextromethorphan#:~:text=Dextromethorphan%20poisoning%20can%20also%20cause%20slow%20breathing%2C%20fast,intent%20such%20as%20insomnia%20and%20dysphoria%20%28unease%2C%20unhappiness%29). Thus, again, KinderFarms' statement that these products are "non-toxic" is not only false and misleading, but dangerous to consumers. Injunctive relief should likewise issue, barring these statements and requiring the recall of product already in the marketplace.

50. Because the entire premise of "clean" medicines is to reduce synthetic, potentially harmful inactive ingredients and incorporate organic and naturally occurring ingredients, consumers electing to purchase clean medicine products care about what they and their children are ingesting and are selecting KinderMed products because of its messaging. Consumers' desire for reassurance that they will receive *safe* and *effective* medicine is illustrated by the fact that KinderFarms describes the KinderMed Kids' Pain & Fever, for example, on KinderFarms' website as "made with the same effective, active ingredient…so you can trust it to provide safe and effective relief for your child."

51. As noted, Genexa's products and KinderMed's products contain essentially identical ingredients. But Genexa does not, because it could not do so responsibly, promote its products as "non-toxic." Only KinderFarms classifies its products as non-toxic. Yet, given the motivations and predilections of consumers seeking to purchase "clean" medicines, KinderFarms' misleading claims that its KinderMed products are "non-toxic" when compared to Genexa's, gives KinderFarms' an important and material, but false and unfair, advantage over Genexa's. Consumers, choosing between two products, one offering the assurance

that it is non-toxic and the other not making that claim, are likely to choose the former, giving KinderFarms' an unlawful edge over Genexa in the marketplace.

**E.    KinderFarms Developed its Competing "Clean" Medicine Products by Wrongfully Using Genexa's Information and Assets**

52.    As noted above, in or around May 29, 2019, a representative from the private equity investment firm ACG reached out to Genexa to express its interest in making an investment in the company.

53.    Initially skeptical, Genexa turned down ACG's offer.  However, the prospect of an injection of new capital became more attractive as Genexa expended significant resources in an effort to develop its novel products.

54.    ACG's assurances that it wanted to move quickly with an investment in Genexa convinced Genexa's co-founders to negotiate a term sheet with ACG in late 2019.

55.    As is standard practice in the private equity business, after the execution of the term sheet, to permit ACG to undertake "due diligence" on its potential investment, ACG and Genexa negotiated and signed a strict Non-Disclosure Agreement ("NDA"), dated January 9, 2020, which, among other things, facilitated ACG's access to Genexa's confidential information, but on the condition that ACG's ability to use and disclose the confidential information it received from Genexa was strictly limited.  Among other things, the NDA provided that:

- ACG would not disclose any Confidential Information received to any third parties; and
- ACG would use the Confidential Information solely for the purpose and in connection with the current or contemplated business relationship.

56.    With the NDA in place, ACG received access to much of Genexa's most confidential information concerning Genexa's operations, quality and

regulatory systems, products, and finances, among other subjects. Specifically, subject to the NDA, Genexa shared with ACG highly confidential information about its business and pending products. This included but was not limited to:

- the ingredients of each of Genexa's products;
- work related to the packaging planned for the products;
- communications with retailers engaged to sell these products; and
- for each Genexa product, relevant testing information, specifications, finished product specifications, and supplier information.

57.     Notwithstanding its initial pursuit of a deal and negotiation of a Term Sheet with Genexa months earlier, and after its receipt of Genexa's proprietary business information (all of which was consistent with the basis for the provisions of the Term Sheet), in April 2020, ACG pulled out of the deal at the last minute, citing personal and Covid-19 rationales for suddenly declining to go forward.

58.     Shortly thereafter, however, ACG was back as an investor in the clean medicine business – this time as an investor in KinderFarms. Genexa is informed and believes that ACG made its initial investment in KinderFarms sometime in 2021. At that time, KinderFarms, a thinly capitalized company, had only launched its Kinderlyte metabolic drink product line. Prior to its communications and discussions with ACG, KinderFarms had not announced its intention of entering into the clean medicine products business and, upon information and belief, that its plan to enter that market were the result of communications with ACG, a firm possessing Genexa's business plans and a wealth of confidential product information, testing information, and other confidential information of Genexa's.

59.     In contrast to the many years of ideation, product development, research, and testing that it took Genexa to plan, develop, test, and manufacture its own clean medicine products, Genexa is informed and believes that KinderFarms

was able to significantly compress this product development cycle, including the research and development process and the requisite stability testing on the final formulation of the products in their final packaging, into a period of less than 18 months. Genexa alleges that KinderFarms was able to short-circuit its clean medicine development process and develop and execute its marketing plans for its clean medicine products as a result of its receipt and use of Genexa's confidential information, subject to and in breach of the NDA between Genexa and ACG.

60. But, confidential information was not the only Genexa asset wrongfully used by KinderFarms in its product development process. In July 2021, Genexa promoted employee Annika Berman ("Ms. Berman") to Senior Quality Manager. During her tenure at Genexa, Ms. Berman originally oversaw all FDA-related quality and regulatory activities for the business, and was responsible for a large variety of activities, including registering Genexa's medicines with the FDA, overseeing stability and product testing, working with manufacturers to ensure R&D was done in a FDA-compliant manner, label review, and product release. While at Genexa, Ms. Berman worked closely with Genexa's executives and consultants to develop the skills to assume responsibility for Genexa's FDA filings. Also while working at Genexa, Ms. Berman received proprietary information, including access to all Genexa's formulations, R&D processes, batch records and manufacturing processes, all product specifications, and the results of all stability tests. She also had access to Genexa's complete, multi-year, future product pipeline for the business. Pursuant to the terms of her contract, she was required to: (1) work full time at Genexa; (2) not accept any employment that would prevent her from fully performing her duties to Genexa (including the duty of loyalty); (3) not directly or indirectly engage in any employment or business activity that conflicts with her employment with Genexa; and (4) not disclose, use, or otherwise exploit in any manner Genexa's Trade Secrets and Confidential Information while she was

1    employed by Genexa.

2        61.    On May 2, 2022, Ms. Berman advised Genexa that she intended to

3    leave her position at Genexa for an undisclosed position, with her last day at

4    Genexa being May 13, 2022.  Immediately upon leaving Genexa, Ms. Berman went

5    to work for KinderFarms.  However, while still employed at Genexa, and just days

6    before informing Genexa of her intent to leave for another position, Ms. Berman

7    took a day off from work at Genexa.  The day she took off was April 29th, 2022.

8    On the same day Ms. Berman took her planned day off at Genexa, KinderFarms

9    submitted filings for three different KinderMed products to the FDA.  Prior to this

10   date, Genexa is informed and believes that KinderFarms had never submitted any

11   OTC drug product filings to the FDA.  KinderFarms was aware that, on the day its

12   filings were made to the FDA, Ms. Berman was still working under contract at

13   Genexa.

14       62.    Prior to employing Ms. Berman as Quality Control Manager, Genexa

15   is informed and believes that KinderFarms had not employed anyone in quality

16   control and the individuals on the KinderFarm team did not have experience with

17   OTC drug filings, including the FDA pre-market submission process required to

18   market OTC drugs.  Filing with the FDA for OTC drugs is a complex process.  It is

19   a specialized, niche area within the world of FDA quality and compliance.  Very

20   few people understand how to do this correctly and in a way that will satisfy the

21   FDA, and it is critical that it is done by someone skilled and experienced in the area

22   because these filings may lower or increase the chances of having any issues with

23   the FDA in the future.  With this in mind, the absence of such personnel made

24   Ms. Berman, and the information she possessed, very valuable to KinderFarms.

25   The foregoing facts and circumstances strongly suggest that Ms. Berman was

26   involved with KinderFarms' FDA filings while still employed by Genexa.

27

28

**COUNT I**

**LANHAM ACT FALSE ADVERTISING AND UNFAIR COMPETITION**

**(15 U.S.C. § 1125 (a))**

63.　　Genexa re-alleges and incorporates by reference herein each allegation contained in paragraphs 1 through 62 above.

64.　　Genexa and KinderFarms both produce and sell "clean" OTC children's medicines to treat various ailments associated with illnesses and everyday malaises.

65.　　KinderFarms' advertisements and statements, as alleged above, including those regarding the "non-toxic" nature of their products and uniqueness of their products (insinuating that it is the first company to produce clean medicine), and that its products are the only clean medicines, are false and misleading, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

66.　　KinderFarms' statements and packaging and other acts that copy Genexa, as alleged above, including those that create the prospect of confusion and reverse confusion in the marketplace, constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

67.　　KinderFarms has made these false and misleading claims in commercial advertisements regarding its KinderMed products.  KinderFarms disseminated the false and misleading statements to the public through commercial advertising and promotion, and thus caused them to enter interstate commerce. KinderFarms' publication, republication, distribution and re-distribution of the false, misleading or deceptive statements constitute commercial advertising and promotion under 15 U.S.C. § 1125(a).

68.　　KinderFarms' false and misleading statements of fact have been and are material, and induce and are likely to continue to induce consumers' purchasing decisions.  Specifically, KinderFarms' false or misleading statements have been and

1   are material to consumers in their determination of which clean medicine product to

2   purchase and whether or not to purchase a clean medicine product at all, including

3   causing consumers to purchase KinderMed clean medicinal products, instead of

4   Genexa's products that do not state they are non-toxic.

5   69.   KinderFarms' false and misleading claims are likely to deceive or

6   confuse a substantial segment of the buying public and, in fact, have actually

7   already deceived or confused a substantial segment of the buying public as to the

8   true characteristics and qualities of KinderFarms' KinderMed products.

9   70.   If KinderMed's customers understood that Genexa and KinderMed are

10   essentially producing the same product and there is no difference in the toxicity, a

11   substantial portion of such customers would have purchased Genexa products in the

12   past or would purchase Genexa's clean medicine in the future.  As a result,

13   KinderFarms' false and misleading statements have injured Genexa's commercial

14   interest in maintaining its strong reputation and selling its line of clean OTC

15   medicine.

16   71.   KinderFarms knows that its statements are false, misleading, or

17   deceptive.  At a minimum, KinderFarms reasonably should know, or failed to

18   investigate so as not to know, that its statements are false, misleading, or deceptive.

19   72.   KinderFarms' false and misleading misrepresentations related to the

20   "non-toxic" nature of its products go to the heart of what consumers may think it

21   means to produce "clean" medicine and will sway consumers when given the

22   option to select between a "toxic" and a "non-toxic" product.  As such,

23   KinderFarms' false statements have proximately caused harm to Genexa.

24   73.   Genexa stands in the class of those protected by the Lanham Act for

25   these particular false statements, and Genexa has a right to sue for redress under

26   that statute.

27   74.   KinderFarms' conduct, as alleged herein, has caused, and will continue

28

to cause, immediate and irreparable harm to Genexa, for which there is no adequate remedy at law.  Unless enjoined by this Court, KinderFarms' acts will irreparably injure Genexa's reputation and goodwill, erode Genexa's market share, and harm unsuspecting consumers who fail to understand the repercussions of utilizing a product that is in fact not "non-toxic."  Pursuant to 15 U.S.C. § 1116, Genexa is entitled to preliminary and permanent injunctive relief to prevent KinderFarms' continuing acts.

75.    Pursuant to 15 U.S.C. § 1117, Genexa is entitled to damages, in an amount to be established by proof at trial, for KinderFarms' Lanham Act violations, an accounting of profits made by KinderFarms on sales of KinderMed products, as well as recovery of the costs of this action.

76.    KinderFarms' acts are willful, wanton, calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Genexa to recover reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**COUNT II**

**FALSE ADVERTISING (CALIFORNIA LAW)**

**(BUSINESS & PROFESSIONS CODE § 17500, *ET SEQ.*)**

77.    Genexa re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 76 of this Complaint as set forth fully herein.

78.    KinderFarms has disseminated, or caused to be disseminated, commercial advertisements, including over the internet (including on social media), and on television from this state throughout this state and other states.

79.    These advertisements involve false and misleading statements of fact by KinderFarms about its own product, including false representations of the originality of its KinderMed products and the quality of its KinderMed products, namely their non-toxic nature.

80.    KinderFarms knew, or should have known, through the exercise of

reasonable care that these statements were untrue or misleading.

81.     KinderFarms' false and misleading advertisements related to the non-toxic nature of its products and as the implied originator of clean medicines are material to consumers deciding to purchase KinderFarms' OTC medicines.

82.     KinderFarms' false representations are likely to deceive a reasonable consumer and have actually deceived a substantial segment of clean medicine consumers.

83.     Genexa has suffered injury in fact and has lost sales and money, and is likely to continue to be injured as a direct and proximate result of KinderFarms' violation of this statute.

84.     Genexa is entitled to damages in an amount to be established by proof at trial for KinderFarms' violations of California law, an accounting of profits made by KinderFarms on sales of KinderMed products, as well as recovery of the costs of this action.

85.     KinderFarms' conduct, as alleged herein, has caused, and will continue to cause, immediate and irreparable harm to Genexa for which there is no adequate remedy at law, and as such, Genexa is entitled to preliminary and/or permanent injunctive relief as described herein.

## COUNT III

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

86.     Genexa re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 85 of this Complaint as set forth fully herein.

87.     ACG entered into a valid and binding non-disclosure agreement with Genexa concerning, among other things, the use and disclosure of Genexa's confidential information ("ACG NDA").

88.     Annika Berman entered into a valid and binding agreement with Genexa concerning the terms and conditions of her employment with Genexa

("Berman Employment Agreement").

89.     KinderFarms is not a party to the ACG NDA or the Berman Employment Agreement.

90.     KinderFarms was aware of the existence and/or the terms and conditions of the ACG NDA and the Berman Employment Agreement.  It knew that ACG explored a potential investment opportunity in Genexa and, as is customary, executed a non-disclosure agreement—the ACG NDA—while doing so to learn confidential information about its operations.  KinderFarms also knew that Ms. Berman was working for Genexa and, as is customary, executed an employment agreement—the Berman Employment Agreement—governing the terms and conditions of Ms. Berman's employment, which would include information concerning the confidentiality of Genexa's information.

91.     KinderFarms used Genexa's confidential business information, covered by the ACG NDA, and used the services of Ms. Berman, who had exclusive obligations to Genexa under the Berman Employment Agreement, to develop, market, and sell its clean medicine products.

92.     ACG and Ms. Berman breached their respective contracts with Genexa.

93.     KinderFarms' actions caused ACG and/or Ms. Berman to breach the ACG NDA and Berman Employment Agreement, respectively, or, at the very least, disrupted the expectations of the contracting parties to these Agreements.

94.     KinderFarms' conduct constitutes intentional interference with Genexa's contractual relations.

95.     Because of such interference, Genexa has suffered damage to its goodwill, reputation, and a loss of sales to be established according to proof.

96.     KinderFarms' conduct alleged herein is fraudulent, oppressive, and/or malicious, entitling Genexa to exemplary damages pursuant to California Civil

Code Section 3294.

## COUNT IV

## CALIFORNIA UNFAIR COMPETITION

## (BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*)

97. Genexa re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 96 of this Complaint as set forth fully herein.

98. KinderFarms' conduct, as alleged herein, is unfair, unlawful and/or fraudulent and such business acts and practices constitute unfair competition in violation of Sections 17200, et. seq., of California's Business & Professions Code.

99. Genexa has suffered injury in fact, has lost sales and money, and is likely to continue to be injured as a direct result of KinderFarms' unfair competition, entitling Genexa to injunctive relief as prescribed by the aforementioned statute.

## V.   PRAYER FOR RELIEF

**WHEREFORE**, Genexa prays for judgment as follows:

1. That judgment be entered in favor of Genexa and against Defendant KinderFarms on all Counts of this Complaint;

2. For an order and judgment in the aggregate amount of Genexa's actual damages, including but not limited to restitution or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by KinderFarms as a result of their unlawful, unfair business acts or practices, in an amount that has yet to be ascertained but to be determined according to proof;

3. For an order and judgment preliminarily and permanently enjoining KinderFarms, its agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from falsely or misleadingly advertising or promoting is products containing acetaminophen, diphenhydramine HCl, phenylephrine HCl, dextromethorphan HBr or guaifenesin

as non-toxic, and requiring that KinderFarms recall and destroy all deceptive advertising materials and place corrective actions to rectify any erroneous impression consumers may have derived concerning the non-toxic nature of its KinderMed products as permitted by Title 15 of the United States Code or the California Business & Professions Code.

4.      For an order and judgment that KinderFarms has violated the provisions of 15 U.S.C. § 1125(a) by unfairly competing against Genexa by using false or misleading descriptions or representations of fact that misrepresent the nature, quality, and characteristics of the active ingredients contained in KinderMed's products.

5.      For an order and judgment directing KinderFarms, pursuant to 15 U.S.C.§ 1116(a), to file with this Court and serve upon Genexa, within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant KinderFarms has complied with the terms of the injunction;

6.      For an order awarding Genexa its costs and attorney's fees as authorized by law, pursuant (but not limited) to 15 U.S.C. § 1117(a);

7.      For an order awarding Genexa enhanced damages pursuant to 15 U.S.C. § 1117(a);

8.      For an order and judgment that KinderFarms has unlawfully interfered with Genexa's contractual relationships as alleged herein and awarding Genexa any and all damages suffered by Genexa in an amount to be determined according to proof;

9.      For an order and judgment awarding Genexa exemplary damages for KinderFarms' interference with Genexa's contracts in an amount that is reasonable, just, and sufficient to deter;

10.      For an order and judgment awarding Genexa prejudgment interest

according to law on all amounts awarded; and

11.   For an order and judgment awarding such other relief as may be deemed just, equitable, and proper in the circumstances.

DATED: December 22, 2022        Respectfully submitted,

By: *// Steven A. Marenberg*

PAUL HASTINGS LLP
Steven A. Marenberg (Bar No. 101033)
stevenmarenberg@paulhastings.com
James Pearl (Bar No. 328410)
jamespearl@paulhastings.com
Jennica K. Wragg (Bar No. 328410)
jennicawragg@paulhastings.com

*Attorneys for Plaintiff, Genexa Inc.*

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Genexa hereby demands a trial by jury as to all issues raised in this Complaint that are triable to a jury.

DATED: December 22, 2022        Respectfully submitted,

By: *// Steven A. Marenberg*

PAUL HASTINGS LLP
Steven A. Marenberg (Bar No. 101033)
stevenmarenberg@paulhastings.com
James Pearl (Bar No. 328410)
jamespearl@paulhastings.com
Jennica K. Wragg (Bar No. 328410)
jennicawragg@paulhastings.com

*Attorneys for Plaintiff, Genexa Inc.*