1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL HASTINGS LLP
Steven A. Marenberg (Bar No. 101033)
stevenmarenberg@paulhastings.com
James Pearl (Bar No. 198481)
jamespearl@paulhastings.com
Jennica K. Wragg (Bar No. 328410)
jennicawragg@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: (310) 620-5700
Facsimile: (310) 620-5800

Attorneys for Plaintiff,
GENEXA INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENEXA INC.,<br><br>        Plaintiff,<br><br>v.<br><br>KINDERFARMS LLC,<br><br>        Defendant. | Case No. 2:22-cv-09291-MWF-SK<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **LANHAM ACT FALSE ADVERTISING AND UNFAIR COMPETITION;**<br><br>2. **FALSE ADVERTISING (CALIFORNIA LAW);**<br><br>3. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**<br><br>4. **CALIFORNIA UNFAIR COMPETITION.**<br><br>**JURY TRIAL DEMANDED.** |

Plaintiff, Genexa Inc. ("Genexa"), upon knowledge and upon information and belief, alleges as follows against Defendant KinderFarms LLC ("KinderFarms"):

## I.    INTRODUCTION AND THE NATURE OF THIS ACTION

1.    This lawsuit, for false and misleading advertising and unfair business practices, is brought by a small company of innovators, Genexa.  Genexa has redefined the over-the-counter ("OTC") medicine market by creating what are known as "clean" medicines – medicines with the same effective active ingredients as their brand-named counterparts, but without any artificial inactive ingredients. In November 2022, KinderFarms, a celebrity-backed business that sells health and wellness products, released a line of "clean" medicines that are extraordinarily similar to Genexa's products.  But, unlike Genexa, KinderFarms (pronounced "Kīnder Farms") markets its products recklessly by making false and misleading statements that could have dangerous consequences for consumers in order to gain a competitive advantage.

2.    In 2020, Genexa, recently described as "One of the World's Most Innovative Companies," created the "clean medicine" category, a submarket within the larger market for OTC medicines.  At that time, Genexa introduced to the market a set of OTC pain and cold relief products designated as "clean," in that they were formulated by removing artificial inactive ingredients like propylene glycol, high fructose corn syrup, sorbitol, dyes, titanium dioxide, sodium benzoate and disodium EDTA that were components of well-known OTC products such as Tylenol pain-relief medicine and Mucinex cough medicine, and replaced them with a unique combination of clean, naturally-based ingredients such as organic agave syrup and citrus extract to accompany the active medicinal ingredients, such as acetaminophen and dextromethorphan.  Genexa described its products, which were the result of several years of innovative research – as "Real Medicine Made Clean"®; that is, medicine made with "the same active ingredients

1   you need, but without the artificial ones you don't."  Genexa's products not only

2   garnered critical acclaim, but successfully appealed to a subsection of the market

3   comprised of consumers who were interested in children's OTC medical products

4   made "clean."

5          3.     In November 2022, Defendant KinderFarms launched a line of its own

6   "clean" OTC medicine products called "KinderMed."  But, in so doing,

7   KinderFarms uses a "dirty" competitive strategy that includes making false and

8   misleading statements about the nature of its products while mimicking, in many

9   material respects, the names of Genexa's products, the ingredients of Genexa's

10  products, the packaging of Genexa's products and many of the marketing

11  techniques used by Genexa, in an effort to give KinderFarms an unfair competitive

12  advantage.

13         4.     Inducing a famous actress, Jessica Biel, a so-called "Founder" of the

14  company and owner of the company, to serve as its pitchperson, KinderFarms has

15  exploited her celebrity status to promote the launch of KinderMed products.  Ms.

16  Biel commercially promotes KinderMed products on social media and on other

17  platforms, including in appearances on national television, to American audiences.

18  In KinderMed's advertising, Ms. Biel has stated that "in the pharmacy aisle, there is

19  nothing with clean and effective ingredients," even though she and KinderFarms

20  are well aware of the existence of Genexa's clean medicine products.

21         5.     Worse yet, Ms. Biel's colleagues at KinderFarms have apparently

22  induced her to make, in advertising and on its products, the false and (dangerously)

23  misleading statement that KinderFarms' products are "non-toxic," when that is

24  demonstrably untrue, in order to gain a competitive advantage over Genexa's

25  products that, in many instances, appear side-by-side with KinderMed in pharmacy

26  aisles.  Genexa's products make no such claim since, as explained below, no such

27  claim can safely and responsibly be made.

28         6.     Genexa welcomes fair and responsible competition not only from

1  traditional pharmaceutical companies and their products, but from purveyors of

2  "clean" medicine products should they enter the "clean medicine" market in the

3  future.  But KinderFarms has gone too far, and by so doing has violated the

4  Federal Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and California law as described

5  herein.  As a result, Genexa is entitled to injunctive and other forms of relief as set

6  forth below.

7  **II.    PARTIES**

8       7.    Plaintiff Genexa Inc. is a corporation duly organized and existing

9  under the laws of the state of Delaware with its principal place of business in

10 Atlanta, Georgia.

11      8.    Genexa is informed and believes that Defendant KinderFarms LLC is

12 a limited liability company, organized under the laws of Delaware, with its

13 principal place of business located within the Central District of California in

14 Redondo Beach, California.  KinderFarms manufactures, markets, sells, and

15 distributes its OTC medicine products under the brand name, "KinderMed," in

16 interstate commerce.

17 **III.   JURISDICTION AND VENUE**

18      9.    This is an action for false advertising and unfair competition under the

19 Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and for false advertising, unfair

20 competition, and intentional interference with contractual relations under California

21 law.

22      10.   This Court has subject matter jurisdiction over this action pursuant to

23 28 U.S.C. § 1331 because the complaint involves a federal question under the

24 Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  This Court also has supplemental

25 jurisdiction over the state law claims arising out of the same conduct that forms the

26 case and controversy at issue under 28 U.S.C. § 1367.

27      11.   This Court has specific personal jurisdiction over KinderFarms.

28 KinderFarms is headquartered in this District and has purposefully availed itself of

the privileges of conducting activities in the forum.  KinderFarms is registered with the California Secretary of State to do business in the state and regularly and systematically transacts business in and directed to the State of California, giving rise to the claims in this action, including its publication of false and misleading statements in commercial advertising.  KinderFarms committed many of the acts that form the basis of Genexa's claims—including dissemination of false and misleading ads—in California and in this District, including via the internet, television commercials, and social media.

12.　　Venue is proper in this District pursuant to 28 U.S.C. § 1391 because KinderFarms transacts business in this District and a substantial part of the events giving rise to the claims occurred and are continuing to occur in this District.

## IV.　FACTUAL BACKGROUND

### A.　Genexa's Revolutionary Development of "Clean" OTC Medicine Products

13.　　For many years, consumers seeking OTC medicines to remedy and reduce common ailments, including coughs, congestion and fevers, were provided little choice in the marketplace.  The OTC drug products manufactured and sold by conventional pharmaceutical companies such as Johnson & Johnson, Pfizer, or Procter & Gamble had effective active ingredients, but also contained, as "inactive" ingredients, a plethora of artificial substances, including dyes, preservatives, sweeteners, common allergens, and other synthetic fillers (e.g., FD&C red dye no. 40, sucralose and titanium dioxide), including ingredients which are banned, or require warning labels, in other countries.

14.　　Genexa was founded in October 2014 by two entrepreneurs, David Johnson and Max Spielberg, with the goal of providing consumers a clean alternative for OTC drug products.  With the increasing prominence of organic, clean products in other industries (namely food, beauty, personal care and cleaning products), Messrs. Johnson and Spielberg recognized a void in the marketplace for

"clean" OTC medicine products.  Thus, they founded Genexa with the mission of revolutionizing the medicine aisle with clean medicines—medicines using the same effective, active ingredients needed to treat the underlying condition, but without the unnecessary artificial ones.

15.    Described by the media as the *first* clean medicine company, Genexa undertook years of research aimed at developing, manufacturing and introducing to the marketplace new OTC medicines containing the same active ingredients as category leaders (e.g., acetaminophen, the active ingredient in Tylenol, and dextromethorphan, an active ingredient in Mucinex and Robitussin cough syrup, to use but two examples) but without any of the unnecessary artificial ingredients— including artificial preservatives, dyes, sweeteners, or common allergens, as inactive components of these well-known products.

16.    To develop its products, Genexa harnessed the knowledge of medical professionals, as well as highly respected experts with extensive experience in the pharmaceutical industry.  Genexa spent several years performing extensive research to find clean, natural substitutions to the synthetics found in nearly all OTC medicines, replacing them with "clean" ingredients that would adequately perform the same functions as these synthetics, thus providing for stable, long-lasting products on pharmacy and retailer shelves.  Ultimately, Genexa settled on incorporating a combination of agave syrup – derived from the naturally occurring agave plant, along with naturally occurring citrus extract – to create the basis for the preservative system that preserves the longevity of Genexa's medicines.  Genexa became the first drug company to use agave and citrus extract in such a manner.

17.    In 2020, Genexa introduced its newly developed products to the market.

18.    Genexa's entry to the marketplace was a seminal development in the consumer pharmaceutical industry; it disrupted the established order of the business, finally offering consumers a real choice.  Since the introduction of its first

products, Genexa has continued to develop and sell new products to a growing customer base (most of whom previously would have purchased traditional OTC medicines full of synthetic inactive ingredients).  Customers have embraced these "clean" OTC alternatives as safe, and in many instances, more desirable products to treat symptoms arising from illness and pain.  Genexa now markets its clean OTC medicines to consumers through over 45,000 retailers nationwide, including through retailers located in the Central District of California, and also sells its products directly to consumers through various online platforms.  It is constantly working to develop new clean medicine products for children and adults.

19.    In accordance with an increasing consumer preference for organic, synthetic-free, and other naturally occurring products—products comprised of "clean" substances—Genexa's OTC medicinal products filled a void in the marketplace and disrupted the traditional OTC pharmaceutical offerings available to purchasers.

20.    After approximately three years of rigorous product development, Genexa launched its first four "clean" OTC pediatric medicines in 2020 under the Genexa brand.  These included:

- Kids' Pain & Fever
- Kids' Allergy
- Kids' Cough & Chest Congestion
- Kids' Tummy Relief

21.    Genexa used the tag line, "Real Medicine, Made Clean" which has been registered with the United States Patent and Trademark Office.

22.    Genexa's products, its industry, ingenuity, and commitment to disrupt the OTC pharmaceutical industry have drawn praise from numerous sources and publications nationwide.  For example,

- In a 2020 article titled, "How Genexa is Leading the Clean Medicine revolution and Getting us to 'Ditch the Dirty'", *Forbes* recognized that

Genexa has created "a new category around clean medicine." (https://www.forbes.com/sites/afdhelaziz/2020/10/13/how-genexa-is-leading-the-clean-medicine-revolution-and-getting-us-to-ditch-the-dirty/?sh=69de2501560f)

- In a different article, *Forbes* noted that "Genexa makes the only OTC medications that are free from allergens and other potentially harmful ingredients." (https://www.forbes.com/sites/meimeifox/2021/01/11/these-2-companies-are-leading-the-clean-wellness-movement/?sh=482e07756af6)

- Recognizing Genexa as the "first and only clean medicine company," Genexa was named to *Fast Company*'s prestigious annual list of the World's Most Innovative Companies in early 2022. (https://www.businesswire.com/news/home/20220308005372/en/)

23.    Since 2020, Genexa has continued to expand its product offerings to include clean drug products for infants as well as for adults.  Genexa has invested millions of dollars in innovation, including developing its formula for "clean" ingredients, to accompany the active science-based medicinal ingredients and other research and development.  Annually, Genexa continues to spend millions of dollars on research and development to continue providing families with clean medicines they can trust.

24.    Genexa has also invested millions more dollars in product marketing; advertising, including media advertising; marketing personnel-related costs; and research and development.  Genexa employs and consults with many research and development professionals, quality control specialists, and individuals with marketing expertise to perfect its products and distribute products to its customer base.  Genexa's significant investments and high standards for quality have yielded considerable goodwill contributing to its superior reputation in the clean medicine

industry.

25.     In an effort to provide families with full transparency and make it easy for families to see what ingredients appear in the OTC products they buy (and what is not in them), Genexa lists directly on its packaging, separate from the requirements imposed by the FDA, all ingredients with the simple statement, "And that's all."



26.     Establishing goodwill and trust with its customers is at the heart of Genexa's business model.  Genexa takes pride in providing families, many of whom are exceptionally skeptical of the "Big Pharma" OTC medicinal products available, with products they can trust.  Genexa has sold its products in the marketplace for over two years, and in the process has built a strong reputation and acquired substantial goodwill.  Genexa has not only built a strong reputation for itself but has cultivated what it means to produce "clean" medicine.

27.     After years of intense research, development, testing, and fundraising, in 2020, Genexa released its first set of clean OTC pediatric medicines using entirely natural or organic inactive ingredients.  Among these ingredients were agave and citrus extract as the base of Genexa's liquid products, making Genexa the first drug

company to use agave and citrus extract as a base for a drug product. Genexa combined agave with citrus extract as the preservative system for its products—a highly unusual and novel concept.

### B.   KinderFarms Launches as a Health and Wellness Brand

28.     Genexa is informed and believes that, in or around 2018, natural products entrepreneur, Jeremy Adams, established KinderFarms and is the founder of the company. At some point thereafter, Mr. Adams recruited well-known actress and model Jessica Biel to serve as the "face" of the company, notwithstanding the fact that Ms. Biel has no background in medicine, science, product development, marketing, or finance. *See, e.g.*, Jessica Biel – Wikipedia. Rather, Genexa is informed and believes that, sometime after the company was founded, and independent of the development of any KinderFarms products, KinderFarms contracted with Ms. Biel, and as part of her compensation for promotional services and lending her name and likeness to KinderFarms, she may have been provided equity in the company.

29.     As of about September 2019, when KinderFarms launched its first products, the company's focus was *not* on the development, introduction, or sale of OTC medicine products, but rather on natural beverage products. Specifically, KinderFarms initially only sold hydration products, including "Kinderlyte," a natural, medical-grade drink (marketed in various flavors) that was designed to help with dehydration. Thereafter, in or around September 2021, KinderFarms launched a product line of organic protein shakes under the label, KinderSprout.

30.     Genexa is informed and believes and thereon alleges that it was not until in or around January 2021 that KinderFarms considered entering the clean OTC medicine business and, at that time, KinderFarms had undertaken no significant research into the composition of any clean OTC products, nor had it commenced the required time-consuming testing of any such products–a requirement before they can be marketed to the public.

**C.      KinderFarms Introduces its Line of Clean Medicine Products Under the Name, KinderMed, which are Similar in Almost Every Material Respect to Genexa's**

31.     On or around November 15, 2022, KinderFarms announced the launch of KinderMed – a line of "clean" children's medicines, also made with clinically proven active ingredients, but with "clean, Kinder [sic] inactive ingredients" creating clean OTC medicine products to compete with Genexa's.  Like Genexa, KinderFarms distributes KinderMed products to retailers nationwide as well as sells its products directly to consumers through various online platforms.  KinderMed branded products now often appear on retailer shelves right next to Genexa's.

32.     Genexa and KinderFarms are the only two companies actively engaged in the production and sale of "clean" OTC medicine products.  As such, the two companies' products directly compete with each other, and KinderMed's sales already have, and will continue to have, the effect of diminishing the sales of Genexa's products.

33.     KinderFarms' clean medicine products share a close similarity to Genexa's products.  For example, as the chart below shows, three of the four OTC "clean" children's medicines included in the KinderMed launch have identical or virtually identical names to Genexa's products.

| **Genexa Product Name** | **KinderMed Product Name** |
|---|---|
| "Kids' Pain & Fever" | "Kids' Pain & Fever" |
| "Kids' Cough & Chest Congestion" | "Kids' Cough & Congestion" |
| "Infants' Pain & Fever" | "Infants' Pain & Fever" |

34.     The near identical nature of the names cannot be attributed to the type of product at issue.  Genexa's product names used terms that were arbitrary and different from those commonly used for these types of products.  For example,

prior to Genexa, pain relief products designed for children used the term "Children's."  Genexa made a conscious decision to use the term "Kids'" instead, and KinderFarms used that, as well as the arbitrary term "Pain & Fever" (including the "&" instead of the more commonly used word, "and").

35.     The ingredients contained in these products are nearly identical, too, as are their descriptions.  Beyond the fact that the active ingredient in Genexa's Kids' Pain & Fever and Genexa's Infants' Pain & Fever, and KinderFarms' Kids' Pain & Fever and Infants' Pain & Fever –  acetaminophen – is the same, more notable is the fact that the inactive ingredients, which distinguish clean medicine products from traditional OTC drug products, are virtually identical (with the exception of the immaterial difference in flavors) as well.  The similarity of ingredients is not dictated by chance or obviousness.  Genexa researched the combination of natural ingredients that would create effective, shelf stable products and be comparable to the chemical ingredients of the leading brands for years.  The combination was unique and new to this line of products.  KinderFarms appears to have largely duplicated Genexa's inactive ingredients.

| Genexa's Product | KinderFarms' Product |
|---|---|
|  |  |

36.     The similarity between the packaging of KinderFarms' KinderMed products and Genexa's products, that have been in the marketplace for over two

years, is apparent and yields the inference that KinderFarms designed its packaging to be as close as possible to Genexa's—a fact which implies that KinderFarms' approach to marketing its products in competition with Genexa's was the result of a deliberate strategy to position its products as close as possible to Genexa's successful products except for the distinguishing and false and misleading statement that its products are "non-toxic" as opposed to Genexa (who properly makes no such claim).  As a comparison of the packaging of the parties' respective "Kids' Pain & Fever" products, set forth below, shows:



37.    The layouts of the packages are almost identical, as are the color, design, type font, and other wholly arbitrary design elements.  Among other things, both packages contain a signed testimonial, signed by their respective "Founders" – an unusual and arbitrary element in and of itself – that is placed in the exact same spot on the packaging above the dosing information.  Both packages incorporate a fanciful drawing of an animal on the front of the packaging, which is not intrinsic to the nature of the product.  Both packages list the ingredients of the product in the exact same spot – again, an arbitrary design decision not dictated by any legal or

regulatory requirement.  Moreover, the tag lines are similar—Genexa's, "Real Medicine, Made Clean" and KinderMed's, "Real Medicine Kinder Ingredients," and both incorporate a statement about the transparency of the ingredients— Genexa's, "And that's all" and KinderMed's, "that's it!"  To put it bluntly, it is hard to see KinderFarms' KinderMed packaging as anything but a deliberate attempt to make its products closely resemble Genexa's.

38.    Another significant and damaging element of KinderFarms' marketing is KinderFarms' deliberate efforts to convince consumers that its clean medicine products are unique and there is nothing else like it in the market even though KinderFarms is not only aware of Genexa's clean medicines, but eager to mimic them.  For example, in a promotional video released by KinderFarms to advertise the KinderMed line, "Introducing KinderMed," Ms. Biel relates that ". . . there was a really major missing element in the pharmacy aisle, *there is nothing with clean and effective ingredients*."  (https://thecitylife.org/2022/11/15/jessica-biels-kinderfarms-launches-clean-medicine-brand-kindermed/; https://vimeo.com/771135871?embedded=true&source=vimeo_logo&owner=188887375).

39.    KinderFarms' claims such as these – to wit, that no clean medicine products other than KinderFarms' are available to consumers seeking such products – are false, misleading, and cause customers to question the nature, qualities and composition of Genexa's products, namely whether Genexa's preexisting products are in fact "clean" at all, which damages Genexa's goodwill and reputation and creates a loss of sales.

**D.    KinderFarms' Advertisements Claiming Their Products are Non-Toxic are False and Misleading**

40.    Ultimately, perhaps the most troubling element of KinderFarms' marketing approach are the false and misleading statements KinderFarms makes about the ***non-toxic*** nature of its KinderMed products.  On the majority of

KinderMed products, in a box, appears the following statement:



**OUR PROMISE**

We founded **Kinder**Farms® to make the effective, non-toxic health products we wanted for our own families available to everyone. By offering cleaner options that are backed by science, we promise to do our part to create a kinder future for every family.

**Jessica Biel**
Co-founder and Parent

41.     KinderFarms' statement that it makes "non-toxic" health products (highlighted above for ease of reference) – is false and misleading.  It is also dangerous and threatens harm to consumers.  KinderFarms repeats these false statements in materially identical form on its website.  *See e.g.*, https://kinderfarms.com/products/kindermed-kids-pain-fever/.

42.     In fact, KinderFarms' KinderMed products are *not* "non-toxic" health products.  KinderMed's "Kids' Pain & Fever" and "Infants' Pain & Fever" products contain acetaminophen.  It is the sole active ingredient found in KinderMed's Infants' Pain & Fever and KinderMed's Kids' Pain & Fever products.  When used properly and in accordance with the recommended daily dosage, acetaminophen is an effective pain-relieving and fever-reducing agent.  But its potential potency cannot be taken lightly, nor can it accurately be described as "non-toxic."

43.     There is a consensus in the medical community, also reflected in guidance by the federal Food and Drug Administration ("FDA"), that acetaminophen is a toxic substance.  Although many perceive that acetaminophen is safe and can be taken with impunity, the truth, however, is that acetaminophen is toxic when taken in excess both acutely and chronically.  Acetaminophen toxicity is a common cause of acute liver failure in children and adolescents.

(https://www.chp.edu/our-services/transplant/liver/education/liver-disease-states/acetaminophen-toxicity).  It has the potential to cause serious liver damage if more than directed is used.  (https://my.clevelandclinic.org/health/articles/21188-acetaminophen-toxicity-in-children-and-adolescents).  And, an acetaminophen overdose can be fatal.

44.     KinderFarms' statement about the non-toxic nature of its products is contrary to the widespread expert consensus that acetaminophen carries toxicity potential, as reflected in FDA information and guidance from health professionals, making KinderFarms' "promise" objectively false and misleading.

45.     An average consumer does not carefully read the fine print containing FDA warnings with a variety of nuances about the active ingredient(s).  In one particular study, only 26% of those surveyed indicated that they bothered to read the active ingredients on the OTC label. (https://www.peoplespharmacy.com/articles/do-you-read-otc-medication-labels-you-should).  Similarly, another study indicated that only 42% of subjects said they read everything on the label when taking an OTC medication for the first time. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6306891/#:~:text=Unfortunately%2C%20multiple%20studies%20suggest%20that,relievers%20before%20use%20%5B3%5D.).  Further, studies also suggest that consumers spend less time viewing warnings compared to other aspects of package labeling (*e.g.*, the brand name). (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6306891/#:~:text=Unfortunately%2C%20multiple%20studies%20suggest%20that,relievers%20before%20use%20%5B3%5D.).  An average customer is more likely to credit the simple, declarative, and unconditional statement on the product he or she is considering purchasing than to parse the complex verbiage on an FDA drug label.

46.     Even for the select few customers who may read the back of the KinderMed packaging that contains various warnings, the vast majority of parents do not possess the scientific knowledge or expertise to parse through such warnings

1    and understand how to interpret these in light of the statement on a separate side of

2    the packaging concerning the "non-toxic" nature of the company's products.

3    47.    Nothing in the "non-toxic" claim language on KinderMed's packaging

4    suggests that this language applies strictly to the non-active ingredients.  Therefore,

5    an average consumer would likely interpret the statement to refer to *all*

6    ingredients—both the active and non-active ingredients.  The bottom line is, the

7    claims about the "non-toxic" nature of KinderFarms' KinderMed products are

8    dangerous to the consuming public and injunctive relief should issue requiring the

9    correction of KinderMed packaging and the recall of products in the marketplace.

10    48.    Likewise, KinderFarms' statements that its Kids' Cough and

11    Congestion product, which contains active ingredients Dextromethorphan HBr and

12    Guaifenesin and Kids' Nighttime Cold and Cough product, which contains

13    Diphenhydramine HCl and Phenylephrine HCl, are "non-toxic" are false and

14    misleading.  Diphenhydramine, an ingredient commonly found in OTC drug

15    products such as Benadryl, is a common cause of anticholinergic toxicity.  In

16    September 2020, the FDA released a warning regarding the dangers of taking more

17    than the recommended doses of Benadryl.  (https://www.fda.gov/drugs/drug-safety-

18    and-availability/fda-warns-about-serious-problems-high-doses-allergy-medicine-

19    diphenhydramine-benadryl).  Additionally, reports of adolescents intentionally

20    overdosing on diphenhydramine has recently drawn national attention.

21    (https://poisoncontrol.utah.edu/news/2021/11/diphenhydramine-toxicity).

22    Dextromethorphan poisoning can also occur.  Though these substances can be safe

23    and effective cough suppressants, recreational and accidental abuse can, and has,

24    occurred with dire consequences because of the inherent toxicity of these

25    substances.

26    (https://www.poison.org/articles/dextromethorphan#:~:text=Dextromethorphan%20

27    poisoning%20can%20also%20cause%20slow%20breathing%2C%20fast,intent%20

28    such%20as%20insomnia%20and%20dysphoria%20%28unease%2C%20unhappine

ss%29).  Thus, again, KinderFarms' statement that these products are "non-toxic" is not only false and misleading, but dangerous to consumers.  Injunctive relief should likewise be issued, barring these statements and requiring the recall of product already in the marketplace.

49.    Because the entire premise of "clean" medicines is to reduce synthetic, potentially harmful inactive ingredients and incorporate organic and naturally occurring ingredients, consumers electing to purchase clean medicine products care about what they and their children are ingesting and are selecting KinderMed products because of its messaging.  Consumers' desire for reassurance that they will receive *safe* and *effective* medicine is illustrated by the fact that KinderFarms describes the KinderMed Kids' Pain & Fever, for example, on KinderFarms' website as "made with the same effective, active ingredient…so you can trust it to provide safe and effective relief for your child."

50.    As noted, Genexa's products and KinderMed's products contain essentially identical ingredients.  But Genexa does not, because it could not do so responsibly, promote its products as "non-toxic."  Only KinderFarms classifies its products as non-toxic.  Yet, given the motivations and predilections of consumers seeking to purchase "clean" medicines, KinderFarms' misleading claims that its KinderMed products are "non-toxic" when compared to Genexa's, gives KinderFarms' an important and material, but false and unfair, advantage over Genexa's.  Consumers, choosing between two products, one offering the assurance that it is non-toxic and the other not making that claim, are likely to choose the former, giving KinderFarms an unlawful edge over Genexa in the marketplace.

**E.    KinderFarms' Use of Genexa's Resources**

51.    KinderFarms is a thinly capitalized company that over the course of the development of its KinderMed product, Genexa is informed and believes and thereon alleges, received important contributions from individuals and/or entities who also possessed confidential and proprietary information about Genexa and its

1    products under obligations to keep this information secret and confidential.[1]

2         52.    Genexa entrusted its employees with large quantities of proprietary

3    business information.  One of those employees was Ms. Annika Berman

4    ("Berman").  In July 2021, Genexa promoted employee Ms. Berman to Senior

5    Quality Manager.  During her tenure at Genexa, Ms. Berman originally oversaw all

6    FDA-related quality and regulatory activities for the business, and was responsible

7    for a large variety of activities, including registering Genexa's medicines with the

8    FDA, overseeing stability and product testing, working with manufacturers to

9    ensure R&D was done in a FDA-compliant manner, label review, and product

10   release.  While at Genexa, Ms. Berman worked closely with Genexa's executives

11   and consultants to develop the skills to assume responsibility for Genexa's FDA

12   filings.  Also while working at Genexa, Ms. Berman received proprietary

13   information, including access to all of Genexa's formulations, R&D processes,

14   batch records and manufacturing processes, product specifications, and the results

15   of stability tests.  She also had access to Genexa's complete, multi-year, future

16   product pipeline for the business.  Pursuant to the terms of her contract, she was

17   required to: (1) work full time at Genexa; (2) not accept any employment that

18   would prevent her from fully performing her duties to Genexa (including the duty

19   of loyalty); (3) not directly or indirectly engage in any employment or business

20   activity that conflicts with her employment with Genexa; and (4) not disclose, use,

21   or otherwise exploit in any manner Genexa's Trade Secrets and Confidential

22   Information.

23

24   [1] For example, a private equity investment firm who, prior to investing in

25   KinderFarms, explored an investment in Genexa became privy to an abundant
     amount of information pursuant to a strict Non-Disclosure Agreement.  The

26   manufacturer of KinderMed was at one point in communications with Genexa and

27   entered into an Intellectual Property Agreement with Genexa and received
     confidential information thereunder.

28

53.     On May 2, 2022, Ms. Berman advised Genexa that she intended to leave her position at Genexa for an undisclosed position, with her last day at Genexa being May 13, 2022.  Immediately upon leaving Genexa, Ms. Berman went to work for KinderFarms.  However, while still employed at Genexa, and just days before informing Genexa of her intent to leave for another position, Ms. Berman took a day off from work at Genexa.  The day she took off was April 29, 2022.  On the same day Ms. Berman took her planned day off at Genexa, KinderFarms submitted filings for three different KinderMed products to the FDA—"Childrens Nighttime Cold and Cough," "Mucus Relief Cough and Congestion," and "Infants Pain And Fever."  Prior to this date, Genexa is informed and believes that KinderFarms had never submitted any OTC drug product filings to the FDA.  KinderFarms was aware that, on the day its filings were made to the FDA, Ms. Berman was still working under contract at Genexa.  A list of KinderFarms' various filings with the FDA associated with its KinderMed products is set forth below.  (https://fda.report/Company/Kinderfarms-L-L-C).

| Device | | Company | Device | | Date |
|---|---|---|---|---|---|
| Childrens Allergy | | KinderFarms, LLC | Otc Medication | | 2022-09-13 |
| NDC 82673-109 | | KinderFarms, LLC | Childrens Allergy | | 2022-09-02 |
| Pain and Fever | | KinderFarms, LLC | Otc Medication | | 2022-06-01 |
| Mucus Relief Cough and Congestion | | KinderFarms, LLC | Otc Medication | | 2022-06-01 |
| Childrens Nighttime Cold and Cough | | KinderFarms, LLC | Otc Medication | | 2022-06-01 |
| Infants Pain and Fever | | KinderFarms, LLC | Otc Medication | | 2022-05-28 |
| NDC 82673-097 | | KinderFarms, LLC | Pain And Fever | | 2022-05-27 |
| NDC 82673-103 | | KinderFarms, LLC | Childrens Nighttime Cold And Cough | | 2022-04-29 |
| NDC 82673-102 | | KinderFarms, LLC | Mucus Relief Cough And Congestion | | 2022-04-29 |
| NDC 82673-096 | | KinderFarms, LLC | Infants Pain And Fever | | 2022-04-29 |

54.     Prior to employing Ms. Berman as Quality Control Manager, Genexa is informed and believes that KinderFarms had not employed anyone specifically in quality control.  Filing with the FDA for OTC drugs is a complex process.  It is a specialized, niche area within the world of FDA quality and compliance.  Very few people understand how to do this correctly and in a way that will satisfy the FDA, and it is critical that it is done by someone skilled and experienced in the area

1   because these filings may lower or increase the chances of having any issues with

2   the FDA in the future.  With this in mind, the absence of such personnel made

3   Ms. Berman, and the information she possessed, very valuable to KinderFarms.

4   The foregoing facts and circumstances strongly suggest that Ms. Berman was

5   involved in some capacity with KinderFarms' FDA filings while still employed by

6   Genexa.

7       55.     Genexa is informed and believes and thereon alleges that in the

8   development of its clean medicine products, KinderFarms induced Ms. Berman to

9   breach her contractual obligations to Genexa.

10                              **COUNT I**

11   **LANHAM ACT FALSE ADVERTISING AND UNFAIR COMPETITION**

12                       **(15 U.S.C. § 1125 (a)(1)(B))**

13      56.     Genexa re-alleges and incorporates by reference herein each allegation

14   contained in paragraphs 1 through 55 above.

15      57.     Genexa and KinderFarms both produce and sell "clean" OTC

16   children's medicines to treat various ailments associated with illnesses and

17   everyday malaises.

18      58.     KinderFarms' advertisements and statements, as alleged above,

19   including those regarding the "non-toxic" nature of their products and those

20   implying that its products are the only clean medicines, are false and misleading

21   and constitute unfair competition in violation of Section 43(a) of the Lanham Act,

22   15 U.S.C. § 1125(a)(1)(B).

23      59.     KinderFarms has made these false and misleading claims in

24   commercial advertisements regarding its KinderMed products.  KinderFarms

25   disseminated the false and misleading statements to the public through commercial

26   advertising and promotion, and thus caused them to enter interstate commerce.

27   KinderFarms' publication, republication, distribution and re-distribution of the

28   false, misleading or deceptive statements constitute commercial advertising and

1    promotion under 15 U.S.C. § 1125(a)(1)(B).

2         60.    KinderFarms' false and misleading statements of fact have been and

3    are material, and induce and are likely to continue to induce consumers' purchasing

4    decisions.  Specifically, KinderFarms' false or misleading statements have been and

5    are material to consumers in their determination of which clean medicine product to

6    purchase and whether or not to purchase a clean medicine product at all, including

7    causing consumers to purchase KinderMed clean medicinal products, instead of

8    Genexa's products that do not state they are non-toxic.

9         61.    KinderFarms' false and misleading claims are likely to deceive or

10   confuse a substantial segment of the buying public and, in fact, have actually

11   already deceived or confused a substantial segment of the buying public as to the

12   true characteristics and qualities of KinderFarms' KinderMed products.

13        62.    If KinderMed's customers understood that Genexa and KinderMed are

14   essentially producing the same product and there is no difference in the toxicity, a

15   substantial portion of such customers would have purchased Genexa's products in

16   the past or would purchase Genexa's clean medicine in the future.  Further,

17   KinderFarms' statements that there are no products like the KinderMed products in

18   pharmacy aisle misrepresents, subtly but deliberately, the nature and qualities of

19   Genexa's clean medicine products in the market place.  As a result, KinderFarms'

20   false and misleading statements have injured Genexa's commercial interest in

21   maintaining its strong reputation and selling its line of clean OTC medicine.

22        63.    KinderFarms knows, or in the exercise of reasonable care should

23   know, that its statements are false, misleading, or deceptive.  At a minimum,

24   KinderFarms reasonably should know, or failed to investigate so as not to know,

25   that its statements are false, misleading, or deceptive.

26        64.    KinderFarms' false and misleading misrepresentations related to the

27   "non-toxic" nature of its products go to the heart of what consumers may think it

28   means to produce "clean" medicine and will sway consumers when given the

1    option to select between a "toxic" and a "non-toxic" product.  As such,

2    KinderFarms' false statements have proximately caused harm to Genexa.

3       65.    Genexa stands in the class of those protected by the Lanham Act for

4    these particular false statements, and Genexa has a right to sue for redress under

5    that statute.

6       66.    KinderFarms' conduct, as alleged herein, has caused, and will continue

7    to cause, immediate and irreparable harm to Genexa, for which there is no adequate

8    remedy at law.  Unless enjoined by this Court, KinderFarms' acts will irreparably

9    injure Genexa's reputation and goodwill, erode Genexa's market share, and harm

10   unsuspecting consumers who fail to understand the repercussions of utilizing a

11   product that is in fact not "non-toxic."  Pursuant to 15 U.S.C. § 1116, Genexa is

12   entitled to preliminary and permanent injunctive relief to prevent KinderFarms'

13   continuing acts.

14      67.    Pursuant to 15 U.S.C. § 1117, Genexa is entitled to damages, in an

15   amount to be established by proof at trial, for KinderFarms' Lanham Act violations,

16   an accounting of profits made by KinderFarms on sales of KinderMed products, as

17   well as recovery of the costs of this action.

18      68.    KinderFarms' acts are willful, wanton, calculated to deceive, and are

19   undertaken in bad faith, making this an exceptional case entitling Genexa to recover

20   reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

21                                **COUNT II**

22                   **FALSE ADVERTISING (CALIFORNIA LAW)**

23              **(BUSINESS & PROFESSIONS CODE § 17500, *ET SEQ.*)**

24      69.    Genexa re-alleges and incorporates by reference each allegation

25   contained in paragraphs 1 through 68 of this Complaint as set forth fully herein.

26      70.    KinderFarms has disseminated, or caused to be disseminated,

27   commercial advertisements, including over the internet (including on social media),

28   and on television from this state throughout this state and other states.

71. These advertisements involve false and misleading statements of fact by KinderFarms about its own product and Genexa's, including but not limited to false representations about the nature of its KinderMed products, namely their non-toxic nature.

72. KinderFarms knew, or should have known, through the exercise of reasonable care that these statements were untrue or misleading.

73. KinderFarms' false and misleading advertisements related to the non-toxic nature of its products and as the implied originator of clean medicines are material to consumers deciding to purchase KinderFarms' OTC medicines.

74. KinderFarms' false representations are likely to deceive a reasonable consumer and have actually deceived a substantial segment of clean medicine consumers.

75. Genexa has suffered injury in fact and has lost sales and money and is likely to continue to be injured as a direct and proximate result of KinderFarms' violation of this statute.

76. Genexa is entitled to damages in an amount to be established by proof at trial for KinderFarms' violations of California law, an accounting of profits made by KinderFarms on sales of KinderMed products, as well as recovery of the costs of this action.

77. KinderFarms' conduct, as alleged herein, has caused, and will continue to cause, immediate and irreparable harm to Genexa for which there is no adequate remedy at law, and as such, Genexa is entitled to preliminary and/or permanent injunctive relief as described herein.

## COUNT III

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

78. Genexa re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 77 of this Complaint as set forth fully herein.

79. Annika Berman entered into a valid and binding agreement with

1  Genexa concerning the terms and conditions of her employment with Genexa

2  ("Berman Employment Agreement").

3       80.   KinderFarms is not a party to the Berman Employment Agreement.

4       81.   KinderFarms was aware of the existence and/or the terms and

5  conditions of the Berman Employment Agreement.  KinderFarms knew that Ms.

6  Berman was working for Genexa and, as is customary, executed an employment

7  agreement—the Berman Employment Agreement—governing the terms and

8  conditions of Ms. Berman's employment, which would include information

9  concerning the confidentiality of Genexa's information.

10      82.   KinderFarms used the services of Ms. Berman, who had exclusive

11 obligations to Genexa under the Berman Employment Agreement, to develop,

12 market, and sell its clean medicine products.

13      83.   Ms. Berman breached her respective contract with Genexa.

14      84.   KinderFarms' actions caused Ms. Berman to breach the Berman

15 Employment Agreement, respectively, or, at the very least, disrupted the

16 expectations of the contracting parties to this Agreement.

17      85.   KinderFarms' conduct constitutes intentional interference with

18 Genexa's contractual relations.

19      86.   Because of such interference, Genexa has suffered damage to its

20 goodwill, reputation, and a loss of sales to be established according to proof.

21      87.   KinderFarms' conduct alleged herein is fraudulent, oppressive, and/or

22 malicious, entitling Genexa to exemplary damages pursuant to California Civil

23 Code Section 3294.

24                          **COUNT IV**

25              **CALIFORNIA UNFAIR COMPETITION**

26        **(BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*)**

27      88.   Genexa re-alleges and incorporates by reference each allegation

28 contained in paragraphs 1 through 87 of this Complaint as set forth fully herein.

89.     Section 17200 of the California Business and Professions Code prohibits, among other things, any "unlawful," "unfair" or "fraudulent" business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

90.     In addition to being unlawful under the federal Lanham Act and Cal. Bus. & Prof. Code Section 17500, *et seq.*, Genexa is informed and believes and thereon alleges that KinderFarms' description of its products as "non-toxic" also constitutes misbranding under, *inter alia*, California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Article 6, Section 111330 (providing that, "any drug or device is misbranded if its labeling is false or misleading in any particular") in addition to 21 U.S.C. Section 331 (prohibiting the "introduction . . . into interstate commerce of any food, drug . . . that is adulterated or misbranded") and 21 U.S.C. Section 352 ("A drug or device shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular.").

91.     KinderFarms' conduct, as alleged herein, is unfair, unlawful and/or fraudulent and such business acts and practices constitute unfair competition in violation of Sections 17200, *et. seq.*, of California's Business & Professions Code.

92.     Genexa has suffered injury in fact, has lost sales and money, and is likely to continue to be injured as a direct result of KinderFarms' unfair competition, including its false and misleading advertising, entitling Genexa to injunctive relief as prescribed by the aforementioned statute.

**V.     PRAYER FOR RELIEF**

**WHEREFORE**, Genexa prays for judgment as follows:

1.     That judgment be entered in favor of Genexa and against Defendant KinderFarms on all Counts of this First Amended Complaint;

2.     For an order and judgment in the aggregate amount of Genexa's actual damages, including but not limited to restitution or disgorgement of all revenues,

earnings, profits, compensation, and benefits that may have been obtained by KinderFarms as a result of its acts and/or omissions described herein, in an amount that has yet to be ascertained but to be determined according to proof;

3.     For an order and judgment preliminarily and permanently enjoining KinderFarms, its agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from falsely or misleadingly advertising or promoting its products containing acetaminophen, diphenhydramine HCl, phenylephrine HCl, dextromethorphan HBr or guaifenesin as non-toxic, and requiring that KinderFarms recall and destroy all deceptive advertising materials and place corrective actions to rectify any erroneous impression consumers may have derived concerning the non-toxic nature of its KinderMed products as permitted by Title 15 of the United States Code or the California Business & Professions Code;

4.     For an order and judgment that KinderFarms has violated the provisions of 15 U.S.C. § 1125(a)(1)(B), Cal. Bus. & Prof. Code §§ 17200, *et. seq.* and 17500, *et. seq.* by unfairly competing against Genexa by using false or misleading descriptions or representations of fact that misrepresent the nature, quality, and characteristics of the active ingredients contained in KinderMed's products;

5.     For an order and judgment directing KinderFarms, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Genexa, within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant KinderFarms has complied with the terms of the injunction;

6.     For an order awarding Genexa its costs and attorneys' fees as may be authorized by law, including, but not limited to, pursuant to 15 U.S.C. § 1117(a);

7.     For an order awarding Genexa enhanced damages pursuant to 15 U.S.C. § 1117(a);

8.      For an order and judgment that KinderFarms has unlawfully interfered with Genexa's contractual relationships as alleged herein and awarding Genexa any and all damages suffered by Genexa in an amount to be determined according to proof;

9.      For an order and judgment awarding Genexa exemplary damages for KinderFarms' interference with Genexa's contracts in an amount that is reasonable, just, and sufficient to deter;

10.     For an order and judgment awarding Genexa prejudgment interest according to law on all amounts awarded; and

11.     For an order and judgment awarding costs and any such other relief as may be deemed just, equitable, and proper in the circumstances.


DATED: February 3, 2023              Respectfully submitted,

                                     By:  *// Steven A. Marenberg*


                                     PAUL HASTINGS LLP
                                     Steven A. Marenberg (Bar No. 101033)
                                     stevenmarenberg@paulhastings.com
                                     James Pearl (Bar No. 328410)
                                     jamespearl@paulhastings.com
                                     Jennica K. Wragg (Bar No. 328410)
                                     jennicawragg@paulhastings.com

                                     *Attorneys for Plaintiff, Genexa Inc.*

1

## **DEMAND FOR JURY TRIAL**

2

Pursuant to Federal Rule of Civil Procedure 38(b), Genexa hereby demands a

3

trial by jury as to all issues raised in this Complaint that are triable to a jury.

4

5

DATED: February 3, 2023              Respectfully submitted,

6

7

By: *// Steven A. Marenberg*

8

9

PAUL HASTINGS LLP
Steven A. Marenberg (Bar No. 101033)

10

stevenmarenberg@paulhastings.com
James Pearl (Bar No. 328410)

11

jamespearl@paulhastings.com
Jennica K. Wragg (Bar No. 328410)

12

jennicawragg@paulhastings.com

13

14

*Attorneys for Plaintiff, Genexa Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28